PAMALA SAYASANE, Calif. Bar No. 185688
Law Office of Pamala Sayasane
660 4th Street, No. 341
San Francisco, California 94107
Telephone: (415) 508-1609
Email: sayasanelaw@yahoo.com

BRIAN M. POMERANTZ, Calif. Bar No. 214264
Law Offices of Brian M. Pomerantz
1710 East Franklin Street, #1040
Chapel Hill, NC 27514
Telephone: (323) 630-0049
Email: habeas@protonmail.com

Attorneys for Plaintiff
CURTIS LEE ERVIN

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS LEE ERVIN, | CASE NO. 4:26-cv-4996 |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| vs. | (42 U.S.C. §§ 1983 and 1988) |
| COUNTY OF ALAMEDA, a municipal organization; | DEMAND FOR JURY TRIAL |
| Defendant. | |

- 1 -
COMPLAINT FOR DAMAGES

Plaintiff Curtis Lee Ervin, by and through his attorneys respectfully alleges as follows:

**INTRODUCTION**

1.     For decades, and at least since the 1980s, the Alameda County District Attorney's Office ("ACDAO") has engaged in an unconstitutional pattern and practice of racial discrimination in jury selection, in violation of *Batson v. Kentucky,* 476 U.S. 79, 89 (1986).  The People of the State of California, through the Office of the Attorney General and the ACDAO and the final policy makers therein, have formally admitted to having engaged in this particular unconstitutional conduct against Plaintiff Curtis Lee Ervin ("Plaintiff" or "Mr. Ervin"), and others including, inter alia, Ernest Dykes, Maurice Boyette, and Mark Schmeck.  As a result of the concession of structural error, Plaintiff, and the aforementioned individuals, have been released from custody.

2.     The admitted violations against Plaintiff, and others, were not done in isolation by rogue prosecutors.  Rather, the misconduct was the product of a deeply rooted unwritten policy and custom—especially in capital cases—to keep Jewish and Black people from serving on juries.  For decades, this widespread practice against Jewish potential jurors was ingrained in Alameda prosecutors based on the ACDAO's long-held belief that those of Jewish descent would be unwilling to send someone to the gas chamber—the method of execution utilized for nearly six decades before Plaintiff's trial.  Plaintiff is informed and believes that Black jurors were targeted in all types of Alameda cases, not just capital ones.

3.     The ACDAO intentionally failed to train, supervise, or instruct its employees regarding constitutional jury selection.  The ACDAO failed to address the misconduct of its employees, reflecting a deliberate indifference to Plaintiff's constitutional rights.

4.     In 2024, prompted by the discovery of prosecutor juror notes in the Ernest Dykes case showing invidious racial discrimination, United States District

- 2 -

COMPLAINT FOR DAMAGES

Judge Vince Chhabria found "strong evidence" of a "pattern of serious misconduct" and ordered disclosure of jury selection notes from all capital cases (approximately 62,000 pages), and review of 34 capital cases prosecuted by the ACDAO. Judge Chhabria's findings catalyzed exposure of a culture of invidious racial discrimination in jury selection that the ACDAO's final policymakers had previously spent decades concealing.

5. On April 22, 2024, then Alameda County District Attorney Pamela Price ("DA Price") publicly acknowledged her office's history of unconstitutionally striking Jewish and Black people from juries, stating, "[t]he evidence that we have uncovered suggests plainly that people did not receive a fair trial in Alameda County and as a result, we have to review all the files." DA Price further acknowledged that "[i]t's not limited to one or two prosecutors, but a variety of prosecutors," confirming that the practice was a widespread, recognized, and ratified custom of the ACDAO.

6. Further evidence of the ACDAO's deliberate indifference is found in internal 2004 meeting notes disclosed by the ACDAO in 2024. These records reveal that when senior leadership was confronted with whistleblower allegations of systemic *Batson* violations, the ACDAO's final policymakers did not initiate corrective training or disciplinary oversight. Instead, the senior prosecutor in charge of investigating the claims coordinated a strategy to discredit the whistleblower and sanitize prosecution files of discriminatory jury selection materials. The affirmative decision to prioritize the preservation of unconstitutional convictions over constitutional mandates, constituted a formal ratification of the discriminatory practices, ensuring the custom remained the operational standard for ACDAO prosecutors.

7. Accordingly, Plaintiff has established a meritorious claim under 42 U.S.C. § 1983 and seeks justice for the immeasurable harm inflicted. There is no dispute that the ACDAO violated Plaintiff's constitutional rights—the Attorney

COMPLAINT FOR DAMAGES

General admitted it.  The ACDAO's unconstitutional conduct led to a death verdict that would not have been achieved via a constitutionally constructed jury.  Not only would Plaintiff not have endured the specific hardships caused by death row versus general population incarceration, he would have been incarcerated for many fewer years than he served.

8.     The evidence shows that the errors were committed knowingly and not in isolation, but rather, borne from the product of a pattern and practice reinforced by those with supervisory authority within the ACDAO.

9.     This civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeks monetary damages for the extraordinary injuries and harm suffered by Plaintiff, who was wrongfully capitally charged, prosecuted, convicted, and imprisoned for almost 39 years—most of it on death row at San Quentin State Prison.

10.     This lawsuit seeks to hold accountable the government entity who is responsible for its agents violating Plaintiff's constitutional rights in order to obtain his conviction, and to recover from them compensation, as well as punitive damages, for Plaintiff's grievous injuries.

**PARTIES**

11.     Plaintiff Curtis Lee Ervin is a 73-year-old Black man currently residing in Richmond, California.  Mr. Ervin was released from custody on August 25, 2025, after nearly 39 years of incarceration.

12.     Defendant County of Alameda ("County") is a municipal organization within the State of California.  The Alameda County District Attorney's Office (previously defined as "ACDAO") is an agency of the County of Alameda, State of California, for whose torts the County is responsible.

**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**

13.     This Court has jurisdiction under 28 U.S.C. § 1331 over claims arising under 42 U.S.C. §§ 1983 and 1988.  This action arises under the Fifth, Sixth, Eighth,

COMPLAINT FOR DAMAGES

and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

14. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions, including the prosecution of Plaintiff in Alameda County and the damages he suffered from his Marin County death row incarceration, giving rise to these claims, occurred within this judicial district.

15. Divisional Assignment (Civil Local Rule 3-5) – Pursuant to Civil Local Rule 3-2(c), this action arises in Alameda County and/or Marin County, where substantial parts of the events or omissions giving rise to the claim and damages occurred. Pursuant to Civil Local Rule 3-2(d), assignment of this action to either the San Francisco or Oakland Division is proper.

16. The Government Claims Act does not apply to Plaintiff's federal claims. *Robinson v. Alameda Cnty.,* 875 F. Supp. 2d 1029, 1044 (N.D. Cal. 2012) ("The filing requirement does not apply to . . . causes of action based upon federal law."); *Conner v. Raver*, 2023 WL 5498728, at *4 (N.D. Cal. Aug. 24, 2023) ("Contrary to Defendants' argument, the Government Claims Act does not apply to Plaintiff's federal claims.") (citing *Williams v. Horvath*, 548 P.2d 1125, 1130 (Cal. 1976) ("[W]hile it may be constitutionally permissible for the Legislature to place [a] substantive impediment in the path of a state cause of action, it is clear that the [S]upremacy [C]lause will not permit a like abrogation of the prerequisites of a federal civil rights litigant.")); *Felder v. Casey*, 487 U.S. 131, 153 (1988) ("A state law that conditions that right of recovery upon compliance with a rule designed to minimize governmental liability, and that directs injured persons to seek redress in the first instance from the very targets of the federal legislation, is inconsistent in both purpose and effect with the remedial objectives of the federal civil rights law. Principles of federalism, as well as the Supremacy Clause, dictate that such a state

COMPLAINT FOR DAMAGES

law must give way to vindication of the federal right when that right is asserted in state court.").

## FACTUAL ALLEGATIONS

**The 1986 Killing of Carlene McDonald**

17.     On November 19, 1986, a complaint was filed in Alameda County Municipal Court charging Plaintiff and co-defendant Robert McDonald with the murder of Carlene McDonald on or about November 6, 1986.  Plaintiff was arrested on November 18, 1986.  The complaint was later amended to include co-defendant Arestes Robinson.  On May 17, 1988, Plaintiff was charged by Information with one count of first degree murder of Carlene McDonald with a financial gain special circumstance, and one count of robbery.  Plaintiff was tried jointly with the co-defendants.  The prosecution argued that co-defendant McDonald hired Plaintiff and Robinson, both Black men, to kill his ex-wife for the sum of $2,500.

18.     Plaintiff pleaded not guilty and denied the special circumstance allegations on September 27, 1988.  The Honorable Philip V. Sarkisian, Alameda County Superior Court, presided over the trial.  Deputy District Attorney ("DDA") James Anderson argued that Plaintiff was the mastermind and responsible for killing the victim, Ms. McDonald.

19.     On February 21, 1991, a jury found Plaintiff guilty of first degree murder, not guilty of robbery, and determined the special circumstance of murder for financial gain to be true.  Plaintiff and co-defendant McDonald received verdicts of death; Robinson received life without the possibility of parole.  Plaintiff was sentenced to death on June 28, 1991.  The conviction and judgment of death were upheld on appeal. *People v. Ervin*, 22 Cal. 4th 48 (2000).

20.     Plaintiff presented evidence on habeas corpus that the prosecution's star witness and uncharged co-conspirator, Armond Jack, was the actual killer.  In exchange for his cooperation, Mr. Jack was given blanket immunity, including immunity for perjury when it was revealed that he had lied during the preliminary

hearing and at trial.

21. Co-defendant Robert McDonald died of cancer at San Quentin State Prison on December 31, 1993. He wanted to give a deposition exonerating Plaintiff but died before he could do so. The transcripts of co-defendant McDonald's *Marsden*[1] hearing reveal that co-defendant McDonald was prevented at trial from testifying that Mr. Jack was the actual killer.

## I. DDA James Anderson Engaged in Racial Discrimination in Jury Selection, in Violation of *Batson*

22. At Plaintiff's capital trial, DDA Anderson engaged in discriminatory jury selection, exercising 15 peremptory strikes to remove 9 of 11 Black prospective jurors. Three Black males and six Black females were struck, leaving one Black man on the petit jury and one as an alternate. Every Black woman who made it to the jury box was excused.

**Background**

23. On December 3, 1990, after almost eight months of selecting a venire, peremptory challenges commenced.

24. The final venire consisted of 110 prospective jurors, 17 of whom were Black.

25. Three Black individuals were among the first called to the jury box: Martin H., Lisa K., and James T. Martin H. was excused due to his inability to impose the death penalty. DDA Anderson used his second peremptory on Lisa K., leaving James T. as the remaining Black prospective juror.

26. During the next three rounds of challenges, two more Black individuals were drawn: Harvey H. and Caroline M. On his fifth challenge, DDA Anderson excused Caroline M. At that point, DDA Anderson had used two of his

---

[1] *People v. Marsden*, 2 Cal. 3d 118 (1970).

COMPLAINT FOR DAMAGES

five challenges on Black women.  The defense noticed a *Wheeler*[2] motion.  The trial court deferred argument on the motion until they had a full box.

27.    DDA Anderson used his next challenge on James T., leaving Harvey H. as the sole Black person in the jury box.  DDA Anderson passed the next round of challenges and the next person drawn was Alfred H., a Black man.  DDA Anderson immediately struck him.  The defense again objected on *Wheeler* grounds.

28.    The next to be drawn were Jo Ann W. and Pamela B., both of whom were Black.  DDA Anderson struck Pamela B. and waited one round of challenges before removing Jo Ann W.

29.    Three Black prospective jurors remained in the box: Lionel J., Eloise K. and Roslyn R.  DDA Anderson struck all of them; each time the defense renewed its objection.  After jury selection was complete, trial counsel made clear their objection on both *Wheeler* and *Batson* grounds.

30.    In an effort to justify his challenges as race neutral, DDA Anderson claimed to have struck Lisa K. and James T. because of their youth and school/work obligations.  However, DDA Anderson had no issue seating white juror Kimberly G., despite her being similar in age to James T., attending the same college as him, and also having a job.  Despite the stated concern for Lisa K.'s youth, she was actually a year older than Kimberly G.  Unlike Kimberly G., Lisa K. had no school commitments.

31.    Another factor that should have made Lisa K. and James T. appealing to DDA Anderson, was their lack of involvement with church.  DDA Anderson said he did not like jurors with a "religious bent" because he believed it would prevent them from voting for the death penalty.  Yet, he chose Kimberly G., who was religious and noted in her juror questionnaire that she was involved with church and church activities.  Moreover, during voir dire she was asked her views on the death

---

[2] *People v. Wheeler*, 22 Cal.3d 258, 272 (1978).

COMPLAINT FOR DAMAGES

penalty and stated she was not particularly in favor of it. "It's just real hard. I don't know exactly how to put it in words. I don't pro it. I don't think that it's the only way to do things. I would think that in decisions like that to be made, it would have to be incredibly proven or incredibly obvious. It's just really hard to put into words as far as that. I don't have any strong answer." Despite Kimberly G.'s stated reticence to impose capital punishment, DDA Anderson did not strike her. Conversely, DDA Anderson claimed one reason he struck Lisa K. was because he felt it would be an "uphill battle" to get her to vote for death for co-defendant McDonald.

32. DDA Anderson also claimed to have struck other Black prospective jurors (Eloise K., Alfred H., Jo Ann W., Lisa K., Caroline M., and Lionel J.) because he believed they would never vote for the death penalty because they were either too religious or leaned too heavily in favor of life without the possibility of parole. This is contradicted by the record.

33. For example, prospective jurors were asked where they fell within DDA Anderson's "Rambo" scale, with 10 being most likely to vote for death. Jo Ann W. rated herself a 7, a very pro death individual. Miss Caroline M. rated herself a 5, and Alfred H. rated himself a 5.

34. On her questionnaire, Jo Ann W. wrote regarding the death penalty, "[i]f the crime fits the punishment then it should be enforced." Similarly, Caroline M. wrote, "I truly believe there is a need for us to have the death penalty in hopes that it will act as a deterrent to violent crimes, but sometimes it will be utilized and should be and I consider this unfortunate." Likewise, Alfred H. wrote, "I am not pro death penalty, but I feel it should be used more often." When questioned, Alfred H. confirmed he was a 5 on the "Rambo" scale and would be able to apply the death penalty given the facts in this case. Similarly, Caroline M. said she would vote for the death penalty in an election, and that if she thought the death penalty was the appropriate punishment she "could vote to put someone to death in the gas

COMPLAINT FOR DAMAGES

chamber." Jo Ann W., who gave herself a 7 on the "Rambo" scale, confirmed her strong support for capital punishment. When asked by DDA Anderson if she was really "strongly in favor of the death penalty," she replied, "yeah."

35. Thus, DDA Anderson's assertion that he struck the aforementioned Black prospective jurors because he feared they would not vote for the death penalty is unsupported by the record. As earlier noted, DDA Anderson had no such concern for the white juror, Kimberly G., who said she was not in favor of the death penalty.

36. Also without merit is DDA Anderson's contention that he struck Lionel J. because he was "barely qualified" and was never "going to impose the death penalty" due to his "extremely weak" answers. The record shows that Lionel J. consistently said on voir dire that his decision to impose the death penalty would be based on the specific facts of the case and that the crime at issue was one where he could definitely consider the death penalty.

37. With respect to Eloise K., DDA Anderson described her as the "biblical college student" who was like "Mother Teresa" and would never vote for death. However, when DDA Anderson questioned Eloise K., she did not consider herself a sympathetic person and believed that people were responsible for their actions. While she initially hesitated when asked if she could impose the death penalty, saying she would need to consider all the facts before making such a decision, during questioning by DDA Anderson, Eloise K. confirmed that she could impose the death penalty on all three defendants.

38. The record shows that DDA Anderson used religion as pretext to justify his race-based peremptory challenges. Despite his stated concern that those with a "religious bent" (Alfred H., Jo Ann W., and Eloise K.) could not impose the death penalty, DDA Anderson had no problem seating white panelists who said during voir dire and/or wrote in their questionnaires that they were actively involved with their churches and religious activities (Judith A., Robert K., Kimberly G., Grace W., and David P.).

- 10 -

COMPLAINT FOR DAMAGES

39. DDA Anderson's excusal of Roslyn R. is perhaps the most telling. DDA Anderson acknowledged that Roslyn R. "could gas" the defendants if it "ever got to the penalty phase;" however, he said he was nonetheless skeptical of her because she was not questioned by defense counsel. Of course, DDA Anderson had no problem with white jurors who were not questioned by the defense. As defense counsel noted, "[t]here was also the suggestion we did not ask questions of Roslyn [R.]. And if the court might recall, during the jury process, I believe there were four or five, at least, prospective jurors that I asked no questions of them. And all of them, save, I believe, [Roslyn R.], happened to be white. [¶] That is not a valid basis to excuse her. That she is Black and [defense counsel] Broom is Black and Mrs. Hardy is Black, and therefore there must be something going on if they failed to examine her. [¶] That argument simply is lacking in merit."

40. DDA Anderson's invidious discrimination, followed by his misrepresentations in order to justify his unlawful conduct, deprived Plaintiff, who is Black, a jury of his peers. The result of DDA Anderson's discriminatory challenges was to seat a jury of eleven white individuals, and one Black male.

41. The problem was obvious to the Ninth Circuit, which ultimately reversed and remanded on the *Batson* issue, finding that a disproportionate number of Black prospective jurors were stricken, and that DDA Anderson misrepresented the record in his attempt to justify the challenges as race neutral. *See Ervin v. Davis*, 12 F.4th 1102, 1104–05 (2021).

**II. The Constitutional Violations Resulted From The ACDAO'S Widespread Practice Of Eliminating Black And Jewish Jurors Based On Race And/Or Ethnicity, And/Or From Failure Of The ACDAO To Train Its Employees Adequately, And/Or Supervise Its Employees**

42. Death sentences in California require, *inter alia*, the defendant to be charged—at the sole and unfettered discretion of the District Attorney—with at least one special circumstance.

- 11 -

COMPLAINT FOR DAMAGES

43. For the special circumstance allegation to be found true, the People are required to prove an enhanced burden of proof. Absent a jury finding the special circumstance(s) to be true, a defendant neither can be sentenced to death, nor to life in prison without the possibility of parole.

44. Death sentences are politically fortuitous. They bolster the "tough on crime" bona fides for District Attorney's facing re-election, and capital convictions are good résumé builders for rank-and-file deputy district attorneys who have ambitions to be appointed to the bench.

45. Determined to ensure the imposition of death sentences, and victory in those cases, the ACDAO set out to rig the juries. ACDAO prosecutors determined that Black and Jewish jurors were unfavorable to them and set out to eliminate members of those two race/ethnicities from their juries. Thus, the ACDAO routinely and as a matter of office-wide practice, used peremptory strikes to eliminate Black and Jewish jurors from service based on their race and/or ethnicity.

46. For decades, the ACDAO had an unwritten policy and/or widespread practice within its office—and particularly its capital unit—of racial discrimination in jury selection. Specifically, and as relevant here, Alameda prosecutors struck Jewish and Black people from capital juries due to a belief that they would not return a death verdict. The error deprived Plaintiff of a jury of his peers and a fair trial.

47. The ACDAO is headed by a District Attorney who ultimately acts as the final policymaker for the ACDAO. The District Attorneys throughout the relevant time periods discussed herein include: John H. Meehan (1981–1994), Thomas J. Orloff (1994–2009), Nancy O'Malley (2009–2023), Pamela Price (2023–2024), and Ursula Jones Dixon (2025–2026).

48. Other policymakers in the ACDAO included:

a. James Anderson, an Alameda County Deputy District Attorney from 1971 to 2004. From 1991—the year he obtained a

COMPLAINT FOR DAMAGES

conviction on Plaintiff's case—until his retirement in 2004, DDA Anderson headed the capital unit. As such, he personally set, established, oversaw, and managed the policies, customs, and practices of the ACDAO capital prosecutions for Defendant County of Alameda, including its unconstitutional practices involving the exclusion of Black and Jewish jurors from capital cases, in violation of Plaintiff's constitutional rights. DDA Anderson has stated that eliminating Jewish and Black jurors was "not a racist thing, but just common sense."

b. John R. ("Jack") Quatman, an Alameda County Deputy District Attorney from 1973 to 1998. In 2003, he was ostracized by his former colleagues for being a whistleblower, when he publicly revealed the ACDAO's unconstitutional jury selection policies.

c. Kenneth Burr, an Alameda County Deputy District Attorney and second in command of the capital unit under James Anderson. He later sat as a judge on the Alameda County Superior Court for two decades.

d. Morris Jacobson, an Alameda County Deputy District Attorney from 1989 to 2005, and then a judge on the Alameda County Superior Court for two decades. DDA Jacobson assisted DDA Colton Carmine with jury selection during Ernest Dykes' capital trial, including the unconstitutional targeting of Black and Jewish prospective jurors. DDA Jacobson also was in charge of the investigation into the allegations raised by whistleblower Jack Quatman, instructing others in the ACDAO "to find dirt on Quatman."

- 13 -

COMPLAINT FOR DAMAGES

49. Other Alameda County Deputy District Attorneys who handled special circumstances homicide cases, and therefore employed the ACDAO's unconstitutional policies included, *inter alia*, Colton Carmine, Ted Landswick, Jon Goodfellow, Albert Meloling, Therese Drabec, and Angela Backers.

50. Defendant County failed to adequately train, oversee, correct, supervise, and/or discipline the ACDAO and its employees whose discriminatory method of jury selection was widely known and practiced within the office.

51. Plaintiff is informed and believes that:

    a.    The ACDAO did not have a written rule of excluding Black and Jewish people from juries, but the rule was known within the office and everyone was expected to follow it;

    b.    It was the ACDAO's standard practice to exclude Jewish and Black potential jurors from capital juries;

    c.    The office "had a policy of not having policies." It was the office culture not to have a written policy for fear of repercussion, because they knew what they were doing was wrong;

    d.    Senior prosecutors like DDAs Anderson and Quatman educated young lawyers on this unwritten policy. This "training" was often conducted where people went for camaraderie and knowledge: the office library and a bar called "The Fat Lady." These were places where oral tradition and office lore were passed along. It was there that junior attorneys learned what they were expected to know, like how to get rid of Black and Jewish jurors. The library and The Fat Lady were considered safe spaces where the prosecutors could say anything. If someone took issue with what was being said, the expectation was that they should get up and leave;

- 14 -
COMPLAINT FOR DAMAGES

e.   Many senior attorneys would not talk to younger attorneys unless they engaged in this culture; and

f.   DDA Quatman formally trained prosecutors in this custom during a large prosecution conference, attended by a few hundred people, that took place in San Diego, California from June 17–19, 1992.  On the first day of the conference, which focused on special circumstances cases, DDA Quatman did a training presentation with Martin Murray, the chief DDA in San Mateo County.  During that conference DDA Quatman told those present to strike Jewish jurors from capital cases.  Some members in the audience expressed shock and objected, but DDA Anderson, who was present, spoke out in defense of DDA Quatman.  Kenneth Burr, second in command of the capital unit, was also present at the training, as was Colton Carmine, whose notes targeting Jewish jurors led to DA Price's admission regarding her office's history of racial discrimination.  After the training, back at the office, DDA Anderson repeatedly told the story of what DDA Quatman had said.  DDA Anderson did not condemn it, and DDA Quatman was never disciplined in any way.  DDA Quatman further shared his jury selection advice with many other deputies within the ACDAO, both privately and in the law library where the prosecutors gathered daily to discuss cases, issues, and strategy.

52.   As head of the capital unit, DDA Anderson was responsible for overseeing and disciplining each of the prosecutors handling special circumstance cases, including ensuring they were properly trained in their constitutional obligations.  The capital unit prosecuted special circumstance homicide cases, but

COMPLAINT FOR DAMAGES

Plaintiff is informed and believes formal training as to the nature and scope of their *Batson* obligations was eschewed in favor of informal passing of the lore. The goal was to not create a trail evidencing the unconstitutional conduct. Like most DA's offices, the ACDAO was a brotherhood where prosecutors were never supposed to "break rank" and complain about a lack of ethics or clear violations of case law. The ACDAO avoided accountability by not putting unethical instructions in writing. The ACDAO passed along its policies and practices through oral tradition, so they could deny any wrongdoing if asked. Instead of putting things in writing, as the Dallas DA infamously did, the ACDAO used the library discussions to educate prosecutors on how to prevail over *Batson* objections.

55.    People like Supervising DDA Anderson, who believed that violating *Batson* was simply "common sense," told attorneys what to do. DDA Anderson routinely applied this "common sense" discriminatory policy in the cases he prosecuted, targeting Black and Jewish people for removal from capital juries. As detailed later herein, five of his cases (Ervin, Hill, Lopez, Lynch, and Thomas) have since been overturned, and/or the defendants resentenced, following the State's acknowledgment of error.

56.    The ACDAO and its attorneys went to great lengths to either be ignorant of its obligations or to feign ignorance, but Tom Orloff, Bob Platt, Jim Anderson, and the other senior deputies at the superior courthouse were well aware of the unwritten jury selection policies. None of them disciplined prosecutors who were unconstitutionally striking jurors, nor did they object to the discussions about how to get away with the unconstitutional practice of striking jurors based on race and/or ethnicity. The practice was so encouraged, and discipline for such unconstitutional strategies so absent, that they did not even object to DDA Quatman's teaching them to deputies statewide at the 1992 San Diego conference.

///

///

COMPLAINT FOR DAMAGES

57. As a result, at best, the ACDAO's compliance with its constitutional obligations was arbitrary, incomplete, and routinely in violation of a defendant's right to due process.

58. Defendant County had actual or constructive notice that this omission in their training program would cause its employees to violate citizens' constitutional rights.

59. The ACDAO's unconstitutional policies began in the first post-*Furman* capital trial in Alameda County, that of David and Kenneth Moore in 1980. Tried by DDA Anderson, the targeting of Black and Jewish potential jurors began there and continued at least through the 2012 trial of David Mills, tried by Jim Meehan, the son of Jack Meehan, the ACDAO District Attorney from 1981 to 1994. The discrimination against Black and Jewish jurors that appears to have begun during the Moores' trial, became systemic during Jack Meehan's time helming the office, as the practice expanded from prosecutor to prosecutor. Because his malfeasance yielded results, DDA Anderson was rewarded by being named the head of the capital unit (AKA the "death team") in 1991, a position he held until his retirement in 2004.

60. The ACDAO's history of discriminatory and unconstitutional conduct, dispensed by design through deliberate mistraining of its employees, particularly in capital cases involving special circumstance prosecutions, is clear from a review of its cases. In chronological order, below are a sampling of cases in which Alameda prosecutors were found to have engaged in racial discrimination in jury selection:

61. *People v. Mitcham*, Alameda No. 76826A – In the 1984 capital trial of Stephan Louis Mitcham, prosecutor Albert Meloling struck eight out of eight Black prospective jurors that made it to the jury box. DDA Meloling's notes showed that he rated each juror as either "K" (indicating a positive rating) or "O" (indicating a negative rating). Each Black juror was identified with the letter "B" next to their

- 17 -
COMPLAINT FOR DAMAGES

name and given an "O" rating.  One juror was noted as "[k]eep if necessary to avoid *Wheeler*," further indicating that DDA Meloling knew his actions were improper and wanted to cover them up, just as was done in Mr. Dykes' trial with a juror identified as "*Wheeler* fodder."  The conviction was overturned by a federal district court based upon this misconduct.

62.     *People v. Hill,* Alameda No. 84675 – DDA James Anderson prosecuted the 1987–88 capital trial of Michael Hill.  As with the other cases prosecuted by DDA Anderson (Ervin, Lynch, Lopez, and Thomas), there was concern over the propriety of his conduct in jury selection.  Ultimately, the ACDAO opted to resolve the matter by recommending resentencing after a court issued an order to show cause on Mr. Hill's claim that DDA Anderson engaged in prosecutorial misconduct pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959).

63.     *People v. Schmeck*, Alameda No. H9033 – In the 1989 capital trial of Mark Schmeck, prosecutor Ted Landswick struck two out of three Jewish jurors, and said on the record that he would strike the third if she made it into the jury box.  In justifying the strikes, DDA Landswick misrepresented the record in several respects, including by feigning ignorance that the jurors were Jewish, despite having questioned them on that subject.  The ACDAO conceded misconduct, the conviction was vacated, and judgment was imposed on a lesser related offense before Mr. Schmeck was then resentenced to a reduced term of imprisonment based on voluntary manslaughter.

64.     *People v. Ervin*, Alameda No. 87023A – In Plaintiff's 1990–91 capital trial, DDA Anderson exercised 15 peremptory strikes, removing 9 of the 11 Black prospective jurors subject to questioning.  Three Black males and six Black females were struck, leaving one Black man on the petit jury and one as an alternate.  By keeping at least one Black man for the sake of appearances, DDA Anderson acted consistently with the office's unwritten policy to cover up the misconduct.  The

- 18 -
COMPLAINT FOR DAMAGES

Ninth Circuit reversed and remanded on Plaintiff's *Batson* claim, finding that DDA Anderson made misrepresentations of the record in his efforts to justify the strikes. Jury selection notes showed that Anderson was exclusively tracking Black jurors and described several as untrustworthy, too cocky, or arrogant. The conviction was vacated after the Attorney General conceded the misconduct.

65. *People v. Lynch*, Alameda No. H010662 – In the 1991–92 trial of Frank Lynch, DDA Anderson used peremptory strikes against three Black women. Jury selection notes indicated that DDA Anderson tracked only the Black jurors, identifying them in some places with a "B" next to their name and in others with a red dot—which he consistently did across his cases. DDA Anderson also ranked these jurors lower than non-Black jurors, with no support in the record for the lower rankings. The conviction was vacated after an Order To Show Cause issued on Mr. Lynch's *Batson* and Racial Justice Act claims, and the ACDAO conceded error on the latter.

66. *People v. Tully*, Alameda No. H9798 – In the 1992 capital trial of Richard Christopher Tully, prosecutor Kenneth Burr used peremptory strikes against four people of color, including three Black jurors, and a juror he believed to be Jewish. With respect to at least one of the Black jurors stricken, prosecutor notes indicate that DDA Burr mischaracterized the juror's responses to create pretextual reasons for the strike. Mr. Tully was resentenced after the ACDAO recommended resentencing based in part on concern over the constitutional implications of those strikes.

67. *People v. Boyette*, Alameda No. 114009B – In the 1993 capital trial of Maurice Boyette, prosecutor Therese Drabec struck four Black women from the jury. DDA Drabec provided pretextual reasons for the strikes that conflicted with the record. Jury selection notes indicated that DDA Drabec was tracking only Black jurors, and had flagged Black jurors multiple times. Consistent with the policy of identifying Black jurors who could be kept in order to cover up the misconduct,

COMPLAINT FOR DAMAGES

DDA Drabec did not strike two Black jurors, and a third was seated after she had run out of peremptory strikes. The ACDAO conceded misconduct, the conviction was vacated, and judgment was imposed on a lesser related offense before Mr. Boyette was then resentenced to a reduced term of imprisonment based on voluntary manslaughter.

68. *People v. Pollock*, Alameda No. H13546 – In the 1994 capital trial of Milton Pollock, prosecutor Colton Carmine used peremptory strikes to exclude four Black women from the jury. Two of the excluded jurors provided answers that should have made them prosecution-friendly and that were similar to answers given by non-Black jurors that were not excluded. The ACDAO recommended resentencing of Mr. Pollock based in part on concern over the constitutional implications of those strikes.

69. *People v. Dykes*, Alameda No. 118376 – In the 1995 capital trial of Ernest Dykes, DDA Carmine struck the only Black juror that made it to the jury box. Notes from this case indicate that DDA Carmine intended to strike all Black and Jewish jurors. Among the notes was the now-infamous, "I liked him better than any other Jew But No Way." The ACDAO conceded misconduct, the conviction was vacated, and judgment was imposed on a lesser related offense before Mr. Dykes was then resentenced to a reduced term of imprisonment based on voluntary manslaughter.

70. *People v. Thomas,* Alameda No. 118686B – DDA James Anderson prosecuted the 1997 capital trial of Keith Tyson Thomas. Due in part to DDA Anderson's documented racial discrimination in jury selection (*see* Ervin, Lynch, Hill, and Lopez), and because no jury selection notes were found pertaining to Thomas' case, in 2024 the ACDAO recommended resentencing out of concern for the constitutional implications presented.

71. *People v. Love*, Alameda No. C124801 – In the 1999 trial of Terrell Love, DDA Carmine, who also prosecuted Messrs. Dykes and Pollock, struck five

COMPLAINT FOR DAMAGES

Black women from the jury.  When a *Batson* challenge was raised, DDA Carmine defended his strikes by pointing to a Black woman who had not yet entered the jury box as one that he would have accepted.  He also claimed he would have kept a Black man struck by the defense.  This is reminiscent of the *Wheeler* pretext notes found in Mr. Dykes' case.  Echoing DDA Anderson, DDA Carmine expressed concern about one juror's religiosity.  Another Black woman was excused because she was married to a college professor, who, in turn, was "the type of person [DDA Carmine] find[s] extremely reluctant to ever impose the death penalty."  The federal court found many of these, and other reasons given by DDA Carmine to be pretextual and reversed Mr. Love's conviction.  *See Love v. Yates*, 586 F. Supp. 2d 1155 (N.D. Cal. 2008).

72.     *People v. Seumanu*, Alameda No. H24057 – In the 2000 capital trial of Ropati Seumanu, prosecutor Angela Backers used peremptory strikes to exclude four Black women from the jury, and the record suggests she likely would have struck a fifth Black juror if she had made it to the jury box.  Prosecutor notes disclosed that DDA Backers had placed black asterisks next to the names of five Black jurors, including three of the jurors she ultimately struck.  No non-Black jurors were marked with asterisks.  The record indicates that some of the struck jurors provided neutral or prosecution-friendly voir dire and questionnaire answers and provided no discernable race-neutral reasons for the strikes.  Mr. Seumanu was resentenced after the ACDAO recommended resentencing based in part on concern over the constitutional implications of those strikes.

73.     *People v. Lopez,* Alameda No. H28492A – In the 2000–01 capital trial of Miguel Augustine Lopez, prosecutor James Anderson used seven of fourteen peremptory challenges to remove all people of color from Mr. Lopez's jury, resulting in a trial by an all-white jury.  Given other evidence of DDA Anderson's discriminatory conduct in jury selection, the ACDAO recommended resentencing

COMPLAINT FOR DAMAGES

of Mr. Lopez based in part on concern over the constitutional implications of those strikes.

74. Although the following cases have not been overturned to date, the ACDAO employed its unconstitutional practices in many other cases, a sampling of which are below:

75. *People v. Friend*, Alameda No. 81254 – In the capital trial of Jack Friend that spanned 1988 to 1992, including a mistrial/retrial on special circumstances and penalty, DDA Ted Landswick (whom the State conceded committed jury selection error in the prosecution of Schmeck) used peremptory challenges to exclude four Black jurors from Mr. Friend's first trial, one Black juror from his second trial, and the only two Jewish jurors from his second trial. Jury selection notes indicate that DDA Landswick was marking Black jurors with a "B" next to their names and was not identifying other jurors by race. One of the Black jurors struck by DDA Landswick had stated, "[w]ell, if somebody takes somebody's life, I just think they need to die." In contrast, a seated white juror said the death penalty was a "last resort." DDA Landswick also rated one of the Jewish jurors his lowest possible rating, with no indication in the record to support such a rating, and despite giving a seated juror who had indicated qualified support for the death penalty a high rating.

76. *People v. Stevens*, Alameda No. 102962A – In the 1992–93 trial of Charles Stevens, DDA Burr used peremptory strikes to exclude seven of eight Black jurors on the petit jury and six of six Jewish jurors. In early 2025, the Attorney General's office disclosed jury selection notes unequivocally establishing that DDA Burr was targeting Jewish jurors. In these notes, DDA Burr tagged several jurors with "Q Rule," i.e. the "Quatman Rule" promoted by DDA Quatman, that Jewish jurors should be removed from capital juries. Mr. Stevens was tried only a few months after DDA Quatman advocated this rule to prosecutors statewide during the now-infamous San Diego training seminar. The *Batson* error in Mr. Stevens' case

COMPLAINT FOR DAMAGES

was recognized by the federal district court judge overseeing the habeas, who denied relief only because of the procedural bars erected by 28 U.S.C. § 2254.

77. *People v. Nadey*, Alameda No. 129807 – In the 1998–99 capital trial of Giles Albert Nadey, DDA Anderson (whom the State conceded committed jury selection error in the prosecutions of Messrs. Ervin, Hill, Lopez, Lynch, and Thomas) used peremptory strikes to exclude five Black women from the jury, and no Black jurors were seated. DDA Anderson provided pretextual reasons for the challenges that are not supported by the record, seating non-Black jurors who provided similar responses to those DDA Anderson allegedly found troublesome.

78. *People v. Lewis*, Alameda No. 128675 – In the 1999–2000 capital trial of Keith Allen Lewis, as she did in *Seumanu*, DDA Backers targeted Black women for removal, striking eight Black women from the jury. In an effort to cover for her misconduct, she left a bi-racial female and two Black men on the jury. DDA Backers' juror notes were missing from her Lewis file. The case is pending before the California Supreme Court.

79. *People v. Sifuentes,* Alameda No. H27160B – In the 2003 capital trial of Miguel Galindo Sifuentes, prosecutor Jon Goodfellow struck nine out of twelve Black jurors. A federal district court found *Batson* error, but the decision was overturned on appeal due to the extremely restrictive standard of 28 U.S.C. § 2254.

80. *People v. Freeman*, Alameda No. 79502A – ACDAO and Defendant County's deliberate indifference to the constitutional rights of capital defendants was first publicly disclosed in 2003, in post-conviction proceedings relating to the 1987 capital prosecution of Fred Freeman. In postconviction litigation, DDA Quatman, who prosecuted Freeman, provided sworn testimony that the ACDAO maintained a standard practice of systematically excluding Black and Jewish jurors—a practice DDA Quatman alleged was encouraged by senior office leadership. Instead of acknowledging or investigating the claims, the ACDAO successfully conspired to discredit DDA Quatman personally.

COMPLAINT FOR DAMAGES

81.     The disclosure of DDA Carmine's notes in the Dykes case confirmed what DDA Quatman said was true, despite DDA Carmine having arguably been the most ruinous witness to falsely discredit DDA Quatman.

82.     The 62,000 pages of notes disclosed thereafter, from decades of prosecutions, confirmed DDA Quatman's testimony at the *Freeman* hearing, and the ACDAO's unconstitutional custom and practice.

83.     Rather than utilizing the opportunity to implement corrective training or transparent audit protocols, the ACDAO's leadership maintained a defensive posture of non-disclosure in order to maintain the coverup.  This failure to act upon decades of notice was a moving force behind the constitutional injury to Plaintiff.

84.     That these notes were in the possession, custody, and control of the ACDAO and Defendant County for decades before any action was taken to acknowledge or correct the constitutional error shows that the ACDAO and Defendant County were deliberately indifferent to their constitutional obligations.

85.     These violations were directly, foreseeably, proximately, and/or substantially caused by the unlawful policies, customs, or practices of the ACDAO, as well as by the deliberate indifference of policymakers at that office, acting on behalf of the Defendant County, to the occurrence of such constitutional violations.

86.     Through the absence of training, oversight, and/or proper management by the ACDAO and its senior employees, the Deputy District Attorneys responsible for capital homicide prosecutions believed it was of no consequence for prosecutors to intentionally eliminate Black and Jewish jurors based on their race and ethnicity.

**III.    Mr. Ervin's Conviction Has Been Invalidated**

87.     On July 30, 2024, after decades of denials, the Attorney General finally conceded that DDA Anderson did in fact engage in racial discrimination in jury selection.  Accordingly, on August 1, 2024, the Honorable Vince Chhabria, United States District Court Judge, vacated Mr. Ervin's conviction.

COMPLAINT FOR DAMAGES

88. On August 19, 2024, the ACDAO initiated proceedings to retry Mr. Ervin.

89. To ensure his freedom after decades of incarceration, he pled no contest to:

      a.     Voluntary Manslaughter (Cal. Pen. Code § 192(a)), receiving a term of eleven years;

      b.     Second Degree Robbery (Cal. Pen. Code § 211-2), receiving a term of five years;

      c.     Kidnapping (Cal. Pen. Code § 207(a)), receiving a term of eight years; and

      d.     Three enhancements for use of a deadly or dangerous weapon during the commission or attempted commission of the three aforementioned felonies (Cal. Pen. Code § 12022(b)(1)), receiving one year terms for each.

90. Mr. Ervin was sentenced to twenty-seven (27) total years. In 1986, when these crimes occurred, he was entitled to a fifty percent credit on time earned for good behavior. Mr. Ervin never had a single infraction in all of his years in prison; therefore, he was entitled to release after thirteen-and-a-half (13.5) years.

91. But for the Defendant County's unconstitutional conduct, Mr. Ervin would have been released from prison on May 18, 2000, and would never had been on death row. That means he would not have been subjected to the solitary confinement of death row, the particularly egregious and unsanitary conditions of death row, the constant psychological torture of having a death sentence hanging over one's head, and the emotional distress of death row.

92. Following his no contest pleas, Mr. Ervin was released from custody on August 25, 2025, after nearly 39 years of incarceration. Because of the unconstitutional conduct of the Defendant County, Mr. Ervin was incarcerated for 25 years, 3 months, and 7 days longer than he should have been.

COMPLAINT FOR DAMAGES

**DAMAGES**

93.    Mr. Ervin was convicted of special circumstances murder and sentenced to death in 1991.

94.    At the time of Mr. Ervin's arrest in 1986, he was 34 years old; he was almost 73 years old upon release in 2025.

95.    Mr. Ervin suffered years of unlawful incarceration, depriving him of his freedom and adequate access to family and loved ones, confined daily to a small cell that weighed on his mental and physical health, and denied adequate healthcare and nutrition.

96.    From 1986–91, while pending trial, Mr. Ervin was incarcerated in the Alameda County Santa Rita Jail.  After the State conceded to having violated his constitutional rights in his first trial, he was housed there again from August through December, 2024, pending retrial after his conviction was vacated.  The Santa Rita Jail has a history of providing substandard care to prisoners, including unsanitary conditions, poor nutrition, and inadequate medical care, resulting in injury and death.  Mr. Ervin likewise suffered from poor healthcare, lack of nutrition, overcrowding, and unsanitary conditions while at Santa Rita Jail.

97.    From 1991–2024, following his conviction and death sentence, Plaintiff was incarcerated at San Quentin State Prison.

98.    As a condemned prisoner, Plaintiff was denied regular housing, liberties, privileges, and programming that the other 25,000+ California prisoners convicted of murder received.  Plaintiff was housed exclusively with hundreds of condemned prisoners for 33 years.  Plaintiff was surrounded by those who were, as a matter of law, deemed to be unworthy of life, and thus separated from all other California prisoners.

99.    As a condemned prisoner, Plaintiff was denied programming and parole eligibility.  As a result, he never was on track to be reviewed for, qualified for, or released on parole, as are all non-special circumstance prisoners.

COMPLAINT FOR DAMAGES

100.    Plaintiff was housed with other condemned men, awaiting execution. He was forced to live with unremitting, cacophonous noise as a result of the close and packed housing conditions and the screaming, banging, and other disturbed noises that many of the mentally ill men with whom he was housed make.  For all of his confinement, Plaintiff endured unconstitutionally cruel and deplorable conditions.

101.    In February 2008, a federal district court judge found that numerous conditions at San Quentin State Prison violated the United States Constitution, including the presence of rodents and vermin on the tiers, flooding from the showers, lack of cleaning supplies, and excessive noise.  *See* Findings of Fact and Conclusions of Law after Bench Trial on Motion to Terminate Consent Decree, *Lancaster v. Tilton*, Case No. C 79-01630 (N.D. Cal. Feb. 15, 2008).

102.    Food quality and quantity was substandard, depriving Plaintiff of adequate sustenance and nutrition; prisoners were routinely served food that was spoiled, such as expired milk, wilted vegetables, dry bread, and sour rotten meat. The quantity and nutritional quality of food provided by the prison was insufficient to maintain Plaintiff's health.

103.    A death sentence, such as Plaintiff's, that does not serve legitimate and substantial penological goals that cannot otherwise be accomplished by an alternative sentence violates the Eighth Amendment.  A punishment is deemed excessive and unconstitutional if it serves no penal purpose more effectively than would a less severe punishment.  Here, the ACDAO has effectively admitted that a less severe punishment was warranted by offering Plaintiff such and aiding in the imposition of it.

104.    Mr. Ervin arrived at San Quentin in 1991, just before the State of California resumed executions.  Mr. Ervin was incarcerated on death row during all thirteen of the executions California carried out after the resumption of the death penalty.  Three other men who were not executed came within hours of execution

COMPLAINT FOR DAMAGES

only to have those executions stayed. Five executions—Robert Lee Massie on March 27, 2001; Stephen Anderson on January 29, 2002; Donald Beardslee on January 19, 2005; Stanley Williams on December 13, 2005; and Clarence Ray Allen on January 17, 2006 —came after the time Plaintiff should have been released from prison.

105. During this same time, several of the executions were botched or unnecessarily torturous. Publicity focused on the torturous nature of the method of execution employed in California, thus adding to Plaintiff's emotional distress.

106. Between April 1992 and January 2006, he endured the psychological trauma of those thirteen executions. For fourteen years, every time a neighbor was led away to the execution chamber, Plaintiff was forced to confront his own state-sanctioned execution. Even after California conducted its last execution in 2006, the psychological trauma continued, as executions were merely on hold, not banned. As a condemned prisoner, Plaintiff suffered nearly four decades of never-ending severe psychological trauma from the threat of execution.

107. Mr. Ervin also had to endure the psychological and emotional torture of being on death row in the summer of 2020, when COVID-19 ran rampant through that institution. By July 17, 2020, there were 2,063 confirmed prisoner tests and 226 confirmed staff cases at San Quentin. U.S. District Court Judge Jon S. Tigar noted that the "number of inmate infections is undoubtedly even higher because hundreds of inmates have refused to be tested." *See Plata v. Newsom*, CAND Case No. 4:01-cv-01351-JST, Dkt. No. 3373, filed July 5, 2020. Even without the additional confirmed cases, the New York Times identified San Quentin State Prison as the second greatest coronavirus cluster in the United States as of July 23, 2020. A dozen death row prisoners died from COVID-19. This was more than twenty years after Plaintiff should have been released. Instead, because of the unconstitutional conduct, he was prevented from choosing where to quarantine and with whom he wanted to quarantine. Mr. Ervin was one of the prisoners who

COMPLAINT FOR DAMAGES

contracted COVID in July of 2020.  His condition was serious, requiring that he be transported to an outside hospital, where he remained for about a week.  He later learned that a COVID-infected prisoner with whom he had rode on the bus to the hospital had passed away.  The news haunted him, as Mr. Ervin himself felt he was near death.

108.    While housed at San Quentin, Plaintiff suffered under an antiquated healthcare system, oftentimes having to endure many months or more of pain while waiting for essential treatment.  For example, for decades Mr. Ervin has suffered from severe sciatica.  His condition worsened with age and having to sleep on a thin prison mattress.  While he eventually received nerve injections, when the treatment wore off and he was once again in severe pain, he was often forced to suffer due to delayed treatment.  When the pain was unbearable—reaching 10 on a scale of 1 to 10—he sometimes was forced to go "man down," triggering a guard to take him for immediate medical care.  Prisoners are often reluctant to go "man down," for fear of retaliation from prison personnel who must then interrupt their schedules in order to attend to the medical emergency, so the need to do so caused further psychological strain on Mr. Ervin.

109.    As a condemned prisoner, all legal visits or visits by family or friends were conducted in a room with a shared wall to the California Department of Corrections and Rehabilitation ("CDCR") execution chamber.

110.    As a condemned prisoner, Plaintiff's liberty was deprived, controlled, and handled by, among others, executioners from the CDCR's execution team.

111.    This psychological burden was the direct and foreseeable result of a conviction the ACDAO and Defendant County knew was engineered by racism and structurally unsound.

112.    Following the closure of death row at San Quentin, from April through August 2024, and December 2024 through August 2025, Plaintiff was incarcerated at the California Healthcare Facility ("CHCF") in Stockton, California.

While CHCF was an improvement from San Quentin, Plaintiff continued to suffer from his confinement and the deprivations therefrom.  Most importantly, while the actual "death row" was closed, death sentences persisted; thus, Plaintiff still endured the psychological torture of having a capital sentence hanging over his head.

## CLAIMS FOR RELIEF

## CLAIM 1

### 42 U.S.C. § 1983 and *Monell*[3] Municipal Liability Against the County of Alameda for the Misconduct of the ACDAO and its Prosecutors

113.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

114.   At the time of Mr. Ervin's capital trial, as a criminal defendant, he was entitled to trial by an impartial jury of his peers, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.

115.   The right to trial by an impartial jury prohibits the prosecution's use of peremptory challenges to eliminate jurors based on their inclusion in a protected class, including, inter alia, excluding jurors based on race, ethnicity, or gender.

116.   The well-established rules regarding prosecutorial conduct in jury selection prohibited ACDAO prosecutors from removing a juror based on race, ethnicity, or gender.

117.   Those who prosecuted Plaintiff's capital trial, led by DDA James Anderson, violated these constitutional mandates.

118.   As set forth above, DDA Anderson illegally struck 9 of 11 Black prospective jurors (3 men, 6 women), leaving one Black man on the petit jury and one as an alternate.  Every Black woman that made it to the jury box was stricken by DDA Anderson.  The record suggests that he also targeted Jewish prospective jurors.

---

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978).

COMPLAINT FOR DAMAGES

119. Due to DDA Anderson's misconduct, the Ninth Circuit reversed and remanded as to *Batson*, finding that a disproportionate number of Black prospective jurors were stricken and that DDA Anderson misrepresented the record in his attempt to justify the challenges as race neutral. *Ervin v. Davis*, 12 F.4th 1102, 1104–05 (2021).

120. After decades of opposing Mr. Ervin's *Batson* claim in state and federal court, in 2024 the Attorney General finally conceded that DDA Anderson did in fact engage in the unconstitutional conduct. Consequently, Mr. Ervin's conviction was vacated.

121. DDA Anderson violated Mr. Ervin's constitutional right to a fair trial by an impartial jury, which directly contributed to the jury's guilt and penalty verdicts.

122. The above misconduct was a substantial cause of Plaintiff's unconstitutional injuries.

123. These violations of Plaintiff's constitutional rights were directly, foreseeably, proximately, and/or substantially caused by the unlawful policies, customs, or practices of the ACDAO, as well as by the deliberate indifference of policymakers at that office, acting on behalf of the Defendant County, to the occurrence of such constitutional violations.

124. Under the principles of municipal liability for federal civil rights violations, at all relevant times, the District Attorney or his/her authorized delegates, had final managerial responsibility for establishing lawful policies of the office and for training, instructing, supervising, and disciplining attorneys and other employees of the ACDAO regarding their constitutional obligations.

125. Nevertheless, at the time of Plaintiff's trial, the ACDAO maintained unlawful policies, customs, and/or practices, and was indifferent to violations of fair trial rights, all of which were a substantial cause of both the violations of his constitutional rights and his damages.

COMPLAINT FOR DAMAGES

126.    Specifically, the ACDAO had an unlawful policy, custom, and/or practice of automatically excluding Jewish and Black jurors in capital cases, in violation of the ACDAO's obligations under *Batson*.

127.    The ACDAO had an unlawful policy, custom, and/or practice of manipulating jury selection in order to mislead the court and defense counsel as to the real reasons for striking jurors.

128.    The ACDAO had an unlawful policy, custom, and/or practice of covering up these constitutional violations by providing false reasons for their strikes to the court and defense counsel.

129.    The ACDAO failed to investigate and correct these constitutional violations when they were revealed by a whistleblower.

130.    The District Attorney and his/her designees, as policymakers for the ACDAO and the County, encouraged such violations through their policy of deliberate indifference to them.

131.    The aforesaid policies, procedures, regulations, practices, and/or customs of the ACDAO were, collectively and individually, a substantial factor in bringing about the aforementioned violations of Plaintiff's rights under the Constitution and laws of the United States, and in causing his damages.

132.    By virtue of the foregoing, the Defendant County is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. §1983, and his resultant injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant County as follows:

1.    Compensatory damages for the harms described above of not less than $40,000,000;

2.    Punitive damages of not less than $250,000,000;

- 32 -

COMPLAINT FOR DAMAGES

3.    Reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

4.    Pre-judgment interest as allowed by law; and

5.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully requests a trial by jury on all appropriate issues raised in this Complaint.


Dated: May 27, 2026                    Respectfully submitted,

                                       */s/ Brian M. Pomerantz*
                                       PAMALA SAYASANE
                                       BRIAN M. POMERANTZ

                                       Attorneys for
                                       CURTIS LEE ERVIN

- 33 -
COMPLAINT FOR DAMAGES